Herbert FREUND et al., Plaintiffs,

v.

MARSHALL & ILSLEY BANK et
al., Defendants.

Ray MARSHALL, Secretary of
Labor, Plaintiff,

v.

R. W. DEKEYSER et al., Defendants.

Nos. 76–C–543, 77–C–276.

United States District Court,
W. D. Wisconsin.

Sept. 24, 1979.

John M. Potter, Wisconsin Rapids, Wis., Richard Bolte, Bolte Law Office, Wausau, Wis., for Freund.

Charles F. Smith, Jr., Tinkham, Smith, Bliss, Patterson & Richard, Wausau, Wis.,

and V. Downing Edwards and Patricia M. Heim, Edwards, Parke & Heim, LaCrosse, Wis., for defendants Marshall & Ilsley Bank, as Personal Representative of Estate of Phillip Slomann, Ashley H. Slomann, Herman Nemzoff, Frank L. Guth, Bonita Rooney, and R. W. DeKeyser.

Frank T. Mustacci, Korth, Rodd, Sommer & Mouw, Rhinelander, Wis., for Olive F. and William Hyland.

Robert N. Eccles and Mary Champagne, U. S. Dept. of Labor, Plan Benefits Sec. Div., Washington, D. C., for Ray Marshall.

Charles F. Smith, Jr., Wausau, Wis., and Patricia M. Heim, LaCrosse, Wis., for defendants DeKeyser, Bauer, Coggins, Rooney, Slomann and Stenberg.

Kenneth M. Hill, Wisconsin Rapids, Wis., for Viola Daly.

LARSON, Senior District Judge.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over these actions under section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). Venue of these actions is proper in this district under section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2). The Secretary of Labor has authority to bring this action under sections 502(a)(2) and (5) of ERISA, 29 U.S.C. § 1132(a)(2) and (5). The action brought by participants is authorized by section 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3).

2. The Northwest Retirement and Investment Club (the Plan) is an employee pension benefit plan within the meaning of section 3(2) of ERISA, 29 U.S.C. § 1002(2), which is maintained by employers engaged in an industry affecting commerce within the meaning of section 4(a)(1) of ERISA, 29 U.S.C. § 1003(a)(1). *See NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1962). The basis for the Court's conclusion that the Plan is subject to the coverage of ERISA has been set forth previously in the memorandum opinion denying defendants' motions for summary judgment. However, in view of the substantial attention devoted to this issue by the parties in their written submissions, and the amount of evidence presented at trial which was not before the Court on the motion for summary judgment, additional discussion by the Court is appropriate.

▮ Those defendants who argue against ERISA coverage place great stock in the fact that the Plan was not qualified for favorable tax treatment under the Internal Revenue Code, 26 U.S.C. § 403 *et seq.* and § 501 *et seq.*, but this argument simply overlooks the statutory scheme of ERISA. Title I of ERISA, known as the labor provisions of ERISA, is administered and enforced by the Secretary of Labor and contains provisions applicable to all employee benefit plans, including pension and welfare plans. Title II, containing the tax provisions of ERISA, amends the Internal Revenue Code insofar as it relates to retirement plans. Title III governs coordination among the agencies enforcing the statute. Title IV establishes a system of termination insurance for tax-qualified, defined benefit plans. Thus, Titles II and IV are limited to tax-qualified plans, see 29 U.S.C. § 1321(a)(1). Title I, however, applies by its terms to all plans which meet the definitions of sections 3(1), (2) and (3), 29 U.S.C. §§ 1002(1), (2), (3), without regard to tax qualification, including all welfare benefit plans and any non tax-qualified pension plans. Thus, the tax status of this Plan does not govern whether it is covered by Title I of ERISA.

The same defendants also, ironically, rely on two Department of Labor regulations to support their position. In regulations codified at 29 CFR § 2510.3–2(d) the Department took the position that certain employee bonus programs would not be regarded as "pension plans" under ERISA. Since the Court has already found that this Plan was not a bonus program, see Finding of Fact No. 8, *supra*, this regulation offers no support to the defendants. In another regulation, 29 CFR 2510.3–1(a)(2), the Department excluded from the definitions of "welfare plan" and "pension plan" some systems of employer checkoff of monies, through payroll deductions, for deposit to savings

accounts owned by employees. Notwithstanding some similarities between such systems and the Plan, the Court has already concluded that the Plan—as a system of employer and employee contributions to a trusteed fund, with contributions and investment earnings of the fund's assets being allocated to individual accounts—is not a system described in these regulations. The Department of Labor obviously shares these interpretations of its regulations as applied to this Plan.

Indeed, were the statutory language and legislative history ambiguous on this issue, well-settled canons of statutory construction would lead the Court toward finding ERISA coverage in this case. Other Courts have noted that ERISA is a comprehensive remedial statute designed to protect the pensions and other benefits of employees, *Marshall v. Snyder*, 430 F.Supp. 1224 (E.D. N.Y., 1977) *aff'd* 572 F.2d 894, 901 (2d Cir. 1977); *Eaves v. Penn*, 587 F.2d 453 (10th Cir. 1978), and have recognized the broad sweep of its provisions. *Nachman Corp. v. PBGC*, 592 F.2d 947 (7th Cir. 1979). With such a statute, a liberal construction is warranted in order to carry out the statute's remedial purposes, *Marshall v. Kelly*, 465 F.Supp. 341, 349 (W.D.Okl., 1979), and coverage should be extended to provide the maximum degree of protection to employees. *Connolly v. PBGC*, 581 F.2d 729, 732 (9th Cir. 1978).

■ 3. In this case, however, the Plan clearly satisfies the statutory requirement that it be established or maintained by employers to provide retirement income to their employees. Section 3(2) of ERISA, 29 U.S.C. § 1002(2) provides:

> The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> > (A) provides retirement income to employees, or

> > (B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . .

The Plan by "the express terms" of the Plan document was established to provide retirement income to employees of the sponsoring companies and this fact alone establishes ERISA coverage. In addition, the evidence set forth in Findings of Fact Nos. 4, 7, and 8, *supra*, establishes that, "as a result of surrounding circumstances" the Plan was established and maintained to provide retirement income to employees and would have done so but for the transactions challenged in these actions. As set forth in the Court's earlier opinion, the Plan document which was distributed to employees is itself persuasive evidence not only of the companies' promise to provide retirement funds but also of their attempts to encourage employees to leave their funds in the Plan for retirement. The fact that the Plan fiduciaries subsequently concluded that certain incentives, such as the 90 day notice and the forfeiture of earnings interest, were unnecessary to encourage the accumulation of funds in Plan accounts did not change the essential nature of the Plan. There is abundant evidence that both Plan officials and Plan participants considered that retirement benefits were being provided by the Plan. Therefore, even absent the "express terms" of the Plan documents, the Court would conclude "as a result of surrounding circumstances" that this Plan operated to provide retirement income to employees.

■ 4. Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), provides in part that

> . . . a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan . . .

By the very nature of their positions, plan trustees and a plan administrator are fiduciaries with respect to a plan. See 29 CFR § 2509.75–8 at D–3. Thus, all of the persons who served as named trustees of the Plan, see Finding of Fact No. 4, *supra*, were fiduciaries with respect to the Plan as of the effective date of ERISA within the meaning of § 3(21)(A). Likewise, R. W. DeKeyser was a fiduciary in his capacity as administrator and during his brief tenure as a trustee.

It is apparent from the evidence that many of these persons were confused about the nature of their fiduciary duties and indeed unsure whether they were fiduciaries with respect to the Plan. Certain of the defendants may have believed that they were removed from fiduciary status when their companies ceased their business affiliations with Northwest or, in the case of Midstates Distributing, when its employees dropped out of the Plan. Their state of mind, however, does not determine their fiduciary status under ERISA. The objectives of ERISA's fiduciary provisions, as described by one of the law's chief sponsors, Senator Harrison Williams, are

> . . . to make applicable the law of trusts; . . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets, and to provide effective remedies for breaches of trust.

U.S.Code Cong. and Admin.News, pp. 4639, 5186, 93d Cong. 2d Sess., 1974. Thus, the intent of Congress was to federalize the common law of trusts applied in view of the special nature and purpose of employee benefit plans. *Marshall v. Teamsters Local 282 Pension Trust*, 458 F.Supp. 986, 990 (E.D.N.Y., 1978). The Court is persuaded that the development of effective fiduciary standards based on traditional trust law is best achieved through an objective standard which can be consistently applied in all cases and that the equities posed by some of these defendants can be fully considered without absolving them of fiduciary liability.[1] Traditional trust law provided that once a trust had been accepted, the trustee could resign only with the permission of a court, with the consent of the beneficiaries, or in accordance with the terms of the trust. Scott on Trusts § 106; Bogert § 511. There is no evidence that any of the original trustees fulfilled any of these conditions prior to July 2, 1976, with the sole exception of Mel Coggins who was replaced by Mr. DeKeyser as a new nominee from Eau Claire Liquor, in accordance with the terms of the Plan document. Accordingly, the Court finds that, absent such a clear resignation or removal under permissible circumstances, these trustees must be held to have continued in their fiduciary status.

Indeed, it is difficult to conclude that these trustees should be absolved of fiduciary responsibilities even after July 2, 1976. The trustee's duty of prudence in all affairs of the trust, codified in section 404(a)(1)(B) of ERISA, extends to his resignation, and his resignation is valid only when he has made adequate provision for the continued prudent management of plan affairs. Scott on Trusts § 106.1, Bogert *op. cit.* §§ 511, 512. The four seller trustees did make provision for future provision of plan affairs and received Mr. Gruman's representation that he would continue the Plan and cause the appointment of successor trustees. However, this representation does not allow them to simply walk away from the Plan prior to the appointment of successors; certainly, their belatedly acquired knowledge that Mr. Gruman was unwilling to repay the notes held by the Plan afforded them no basis for assuming that the Plan's future was safe. The three other old trustees—Bauer, Daly and Stenberg—cannot even claim that they resigned because of Mr. Gruman's representation of which they were unaware. Accordingly,

---

1. Rights of contribution or indemnity between or among breaching fiduciaries are within the equitable discretion of the Court and may be granted, as just, under the facts of the case. See Bogert, Trusts and Trustees, § 862, p. 24.

Generally, a trustee may be liable for indemnity in situations where he was substantially more at fault than others, where he has profited from the breach or when the breach was committed in bad faith. 3 Scott on Trusts § 258.

the Court concludes that all of the old trustees, except Mel Coggins but including DeKeyser, remained trustees of the Plan after July 2, 1976.

5. Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), provides that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title.

The Court of Appeals for the Tenth Circuit has aptly described this section as embodying the "central and fundamental obligation imposed on fiduciaries by ERISA" and as containing

a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn, supra,* 587 F.2d at 457.

6. In causing or permitting virtually all of the Plan's assets to be loaned back to the sponsoring companies in exchange for unsecured promissory notes the defendants DeKeyser, Ashley Slomann, Rooney, William Hyland, Bauer, Coggins, Daly, and Stenberg (hereafter "the old trustees") failed to discharge their duties with respect to the Plan solely in the interests of the Plan's participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable Plan administration expenses as required by section 404(a)(1)(A) of ERISA. The complete lack of security on the notes presented significant risks for the Plan which later became realities, and the interest rates paid on the notes, while generally considered high by both the trustees and Plan participants, did not adequately compensate for the risks involved. Significantly, an arm's length lender making loans to one of the same companies for the same purpose as the Plan obtained both a higher interest rate and additional security, in the form of valuable personal guarantees, neither of which advantages were obtained by the Plan. Under these circumstances, the old trustees violated their duty of prudence imposed by section 404(a)(1)(B). *Marshall v. Kelly, supra.* Finally, it can hardly be disputed that the investment of virtually all of the Plan's assets in loans to affiliated companies, on its face, represents a complete failure to diversify the investments of the Plan so as to minimize the risk of large losses as required by section 404(a)(1)(C). *Marshall v. Teamsters Local 282 Pension Trust Fund, supra.* The Conference Report on ERISA makes clear that, once a plaintiff proves a failure to diversify, the burden shifts to the defendant to demonstrate that nondiversification was prudent under the circumstances. H.Rep.No.93–1280, 93d Cong., 2d Sess. at p. 304 (hereafter Conference Report). Here, the evidence demonstrates that the nondiversification accentuated, rather than minimized, the risk of large losses. The old trustees have thus not satisfied their burden, and, therefore, they violated section 404(a)(1)(C).

7. The general fiduciary obligations imposed by section 404 are supple-

mented by the specific prohibitions of section 406, 29 U.S.C. § 1106, which Congress enacted to prevent categories of transactions which offer a high potential for insider abuse of plans or for loss of plan assets. *Marshall v. Kelly, supra,* 465 F.Supp. at 354. Section 406(a) of ERISA, which generally prohibits transactions between a plan and certain "parties in interest" provides, in part, that, subject to certain exemptions:

    (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should have known that such transaction constitutes a direct or indirect . . .

        (B) lending of money or other extension of credit between the plan and a party in interest . . .

        (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan, . . .

The legislative history of these provisions underscores the absolute nature of their prohibitions. As passed by the House of Representatives, Section 111 of H.R. 2, the pension reform bill which became ERISA, prohibited only party-in-interest transactions which were entered into for "less than adequate consideration". *See* Legislative History of the Employee Retirement Income Security Act of 1974 at p. 3951 (subcommittee print). In Conference, however, the "adequate consideration" requirement was dropped, and the final bill prohibited all such transactions regardless of whether adequate consideration was received.[2] Thus, the Congressional intent is clear that, absent a statutory or administrative exemption, plan fiduciaries were forbidden to cause a plan to engage in such a transaction regardless of whether any harm actually resulted from such a transaction.

    8. Section 3(14)(C) of ERISA, 29 U.S.C. § 1002(14)(C), includes within the definition of a "party in interest" to a plan "an employer any of whose employees are covered by such plan." Thus, each of the sponsoring companies which borrowed money from the Plan was a party in interest to the Plan because its employees were participants in the Plan. There is no question that a prudent fiduciary should have known of the party-in-interest relationship to the Plan of the borrowing companies. *See* Conference Report at p. 307, *Marshall v. Kelly, supra.* Accordingly, unless some exemption applies, the old trustees violated sections 406(a)(1)(B) and (D) by causing the Plan to lend and transfer Plan assets to, and extend credit to, companies which they should have known were parties in interest to the Plan.

    9. Section 406(b)(1) and (2) of ERISA, 29 U.S.C. § 1106(b)(1) and (2) provide that

    a fiduciary with respect to a plan shall not—

        (1) deal with the assets of the plan in his own interest or for his own account,

        (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

Section 406(b) supplements the party-in-interest prohibitions of section 406(a) by prohibiting any fiduciary from acting in a situation in which he has a *personal interest* which may conflict with the interest of the plan for which he acts. See Conference Report at p. 309. Specifically, a plan fiduciary cannot, without violating § 406(b)(1), use any of his fiduciary authority to cause the plan to make a loan to an entity in which he has an interest. Moreover, be-

---

2. Section 503(b) of the Internal Revenue Code, 26 U.S.C. § 503(b), which governed tax-qualified retirement plans prior to ERISA, generally prohibited loans from an exempt trust to a substantial contributor to the trust "without the receipt of adequate security and a reasonable rate of interest". Regulations promulgated by the Internal Revenue Service defined "adequate security" as something in addition to a mere promise to pay. § 1.503(c)–1(b). Engaging in a prohibited transaction could result in excise taxes and in disqualification of the plan, i. e. loss of its tax-exempt status. Thus, it is not surprising that this Plan, which was intended to make unsecured loans to its sponsors, was established without an attempt at tax qualification.

cause the interests of a lender and a borrower are, by definition, adverse, a fiduciary cannot act in a loan transaction on behalf of a party borrowing from the plan without violating § 406(b)(2). *Cutaiar v. Ray* [sic, *Marshall*], 590 F.2d 523 (3d Cir., 1979); *Marshall v. Kelly, supra,* 465 F.Supp. at 353. The Plan document required the trustees to approve the administrator's actions. In addition, the evidence shows that the loans from the Plan to the sponsoring companies were discussed among and approved by the top management of the sponsoring companies, and, therefore, each fiduciary who was part of this top management —DeKesyer, Ashley Slomann, William Hyland, and Rooney—may fairly be said to have acted in each of the loan transactions. Moreover, although not each of these persons held an ownership or management interest in each of the borrowing companies, the companies were so related and interdependent, that each fiduciary had an interest in each borrower, and, in effect, represented both sides in the transaction. Accordingly, the Court concludes that in making and approving loans, these four defendants violated sections 406(b)(1) and (2).

10. The old trustees generally contend that their conduct with respect to the Plan's loans to the companies is exempted by section 414(c)(1) of ERISA, 29 U.S.C. § 1114(c)(1), which provides, in part

(c) Section 406 . . . shall not apply—

(1) until June 30, 1984, to a loan of money or other extension of credit between a plan and a party in interest under a binding contract in effect on July 1, 1974 (or pursuant to renewals of such a contract), if such loan or other extension of credit remains at least as favorable to the plan as an arm's length transaction with an unrelated

party would be, and if the execution of the contract, the making of the loan, or the extension of credit was not, at the time of such execution, making, or extension, a prohibited transaction [under prior law] . . .

Defendants' reliance on this exemption is misplaced for several reasons. First, even if this exemption were fully applicable, it would not apply to any of the breaches of fiduciary duty under section 404(a)(1). Not only is this conclusion self-evident from the statutory language, but it is reinforced by the legislative history which expressly states that exemptions from the prohibited transaction provisions "have no effect with respect to the basic fiduciary responsibility rules" of § 404(a)(1), Conference Report at 310–311. Second, the evidence shows, see Finding of Fact No. 11 *supra,* that only $150,000 of the $439,000 in loans which were outstanding as of July 2, 1976 had been entered into before July 1, 1974. There is no claim or evidence that any other loans were entered into pursuant to a binding contract in effect on July 1, 1974 or pursuant to renewals of such a contract. A pre-July 1, 1974 practice of making plan investments, in this case the consistent pattern of lending Plan monies to the sponsoring companies, does not justify any exemption under § 414(c)(1) for post-ERISA loans made pursuant to the same pattern. Unless a binding contract exists, no further such loans can be made. Therefore, $289,000 of the loans would not be insulated by the exemption in section 414(c)(1), even if the conditions of this exemption were satisfied. Third, the $150,000 in loans which were made pursuant to a binding contract in effect on July 1, 1974 do not qualify for the exemption because they did not remain at least as favorable to the plan as an arm's length transaction with an unrelated party.[3]

---

**3.** The Hyland defendants also argue that ERISA does not apply to the $150,000 in outstanding loans made prior to ERISA and rely for their argument on *Martin v. Bankers Trust Co.,* 565 F.2d 1276 (4th Cir. 1977); *Morgan v. Laborers' Pension Trust Fund,* 433 F.Supp. 518 (N.D.Cal.1977); *Cowan v. Keystone Employee Profit Sharing Fund,* 586 F.2d 888 (1st Cir.

1978). Each of these cases stand for the undisputable proposition that Congress did not intend ERISA to be applied retroactively or that pre-ERISA conduct be judged by ERISA standards. Plaintiffs in these actions are not attacking the original making of these pre-ERISA loans but merely the defendants' post-ERISA conduct as to these loans. A unanimous line of

For a loan to remain "at least as favorable" as an arm's length transaction, its terms must be at least as favorable as those in an otherwise identical normal commercial setting and the plan must require termination or modification of the loan if it would reasonably be expected to do so in a normal commercial setting. *See* 44 Fed.Reg. 24876, April 27, 1979. As set forth in Conclusion No. 6, *supra*, the terms of these loans were not as favorable as those demanded by an arm's-length lender. Moreover, while the loans became markedly less favorable to the Plan, nothing was done to modify or terminate the loan arrangements. Indeed, new loans were extended on the same terms to Eau Claire Liquor Co. during a time when its working capital was suffering a considerable erosion (see Findings of Fact Nos. 11 and 15, *supra*; T. T. Baumann). More significantly, the loans were left outstanding on identical terms through the sale transaction, at a time when any normal commercial lender would have demanded their termination or modification. Accordingly, the § 414(c)(1) exemption does not apply to any of these loans, and those defendants listed respectively in Conclusion Nos. 8 and 9, *supra*, violated sections 406(a)(1)(B) and (D) and 406(b)(1) and (2).

■ 11. ERISA as a whole is a complex statute, but the concepts which underlie its fiduciary provisions are straightforward and have long formed the basis of the law of trusts. At the heart of the fiduciary relationship is the duty of complete and undivided loyalty to the beneficiaries of the trust. In the classic description of then-Judge Cardozo:

> Many forms of conduct permissible, in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then *the standard* of behavior.

*Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1929)

The conduct of those Plan fiduciaries who took an active role in the sale transaction, i. e., the active management trustees DeKeyser, Ashley Slomann, William Hyland, and Rooney, fell far short of this high standard of behavior. As set forth in Findings of Fact Nos. 12, 14 and 16, each of these trustees either stood to benefit personally, or represented persons who stood to benefit, from the payment for stock or repayment of stockholder loans which were conditions of the sale. Under such circumstances, section 406(b)(2) absolutely prohibited them from even attempting to act on behalf of the Plan. *Cutaiar v. Marshall, supra.* Yet these defendants not only acted on behalf of the Plan but acted consistently to favor their personal interests over those of the Plan. Accordingly, they failed to discharge their fiduciary duties solely in the interests of Plan participants and beneficiaries and for the exclusive purpose of paying Plan benefits and defraying administrative expenses in violation of section 404(a)(1)(A); they dealt with Plan assets in their own interest in violation of section 406(b)(1); and they acted in a transaction involving the Plan on behalf of persons with interests adverse to the interests of the Plan and its participants and beneficiaries in violation of section 406(b)(2).

■ Probably due to their divided loyalties, these defendants also failed to exercise the care, skill, prudence and diligence demanded by section 404(a)(1)(B). Their own testimony that they failed to perceive the serious and easily foreseeable danger which the sale transaction posed for the Plan is a virtual admission of lack of diligence. The uncontradicted testimony that they belatedly recognized the danger to the Plan, but went no further than to register an ineffective protest for fear of stopping the sale, further underscores the

cases holds that such an application of ERISA does not constitute retroactive application and that a fiduciary's conduct as to an investment is not forever insulated because the investment was originally made prior to ERISA. *Morris-*

sey v. Curran, 567 F.2d 546 (2d Cir. 1977); *Marshall v. Craft*, 463 F.Supp. 493 (N.D.Ga. 1978); *see also Marshall v. Edison Brothers Pension Plan*, 593 F.2d 307 (8th Cir. 1979).

seriousness of their abandonment of fiduciary responsibility. Those positive actions which they took to consent to the sale transaction and various of its terms on behalf of the Plan, without securing advantage or protection for the Plan, also were imprudent in violation of section 404(a)(1)(B).

12. The Plan was heavily invested in the companies' debt obligations, and both the companies' financial status and the Plan's ability as an unsecured creditor to realize repayment from the companies' assets were likely to be significantly altered by the sale. In addition, the Plan's participants had rights to withdrawals which could have been exercised prior to the sale as the defendants were themselves able to do in June 1976. Under those circumstances, the seller trustees' duties of loyalty and prudence imposed on them a duty to advise the participants of the full facts concerning the sale. Indeed, the seller trustees appeared to recognize the possible interest which participants would have in learning of the sale by imposing on Gruman a contractual duty to notify the participants about the sale. Even this modest provision, however, which failed to clarify either the timing or content of the notice to be provided by Gruman, was dropped and replaced by the meaningless notice from Gruman to DeKeyser. In failing to provide adequate notice to participants, these defendants violated sections 404(a)(1)(A) and (B). By agreeing to accept notice and by accepting notice knowing that participants were deprived of adequate notice, Mr. DeKeyser violated section 406(b)(2) by acting in a transaction involving the Plan on behalf of parties, namely himself and the other sellers who desired to consummate the sale, with interests adverse to the interests of the Plan's participants and beneficiaries.

13. The defendants Bauer, Coggins, Daly, and Stenberg are not relieved of their fiduciary responsibilities by their lack of involvement in the sale transaction. By failing to monitor the conduct of the seller trustees, they failed to discharge their fiduciary duties with the prudence and diligence required by section 404(a)(1)(B). In addition, section 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2), provides that a fiduciary is liable for the breach of a co-fiduciary

(2) if, by his failure to comply with section 404(a)(1) of this title in the administrtion of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; . . .

The Conference Report explains the import of this provision through use of the following example:

For example, A and B are co-trustees and are to jointly manage the plan assets. A improperly allows B to have the sole custody of the plan assets and makes no inquiry as to his conduct. B is thereby enabled to sell the property and to embezzle the proceeds. A is to be liable for a breach of fiduciary responsibility.

Conference Report at p. 300.

The terms of the Plan document contemplated that the actions of Mr. DeKeyser would be subject to the approval of the Plan's trustees, yet most of those trustees allowed him to operate the Plan without "inquiry as to his conduct". Likewise, the failure of these trustees to exercise any of their fiduciary obligations enabled the seller trustees to commit the various breaches set forth in previous Conclusions. Accordingly, these trustees also share fiduciary liability for these breaches.

14. In the original complaint filed in the *Freund* action, NWLI alleged itself to be the Plan's administrator and therefore a Plan fiduciary. Gruman apparently contends that NWLI alone held fiduciary duties and that he personally had none. However, officials of a company which sponsors a plan are themselves fiduciaries to the extent that they retain authority for selection and retention of plan fiduciaries because, to that extent, they have retained "discretionary authority or discretionary control respecting management" of the plan, see 29 CFR § 2509.7–8 at D–4. As the responsible official of NWLI, Gruman retained this fiduciary duty to select and re-

tain Plan trustees. This conclusion is not altered by the fact that Gruman assigned to NWLI all of his rights and obligations under the sale documents (P. Ex. 11L) including, presumably, the responsibility he had assumed for selecting successor trustees of the Plan (P. Ex. 11E, ¶ 11). Gruman was still the person who controlled NWLI. Even if this had not been so, he had a duty to the Plan to discharge this assignment prudently and, to that limited extent, if he failed to act prudently in such an assignment he would share co-fiduciary liability under section 405(a)(2) of ERISA for any breaches of trust on the part of his assignee, see 29 CFR § 2509.7–8 at D–4. In addition to any fiduciary and co-fiduciary duty to select and retain Plan trustees, Gruman himself personally exercised authority and control respecting management and disposition of Plan assets by deciding not to demand payment of the notes held by the Plan and not to honor participants' withdrawal requests. While it is indeed contemplated under ERISA that a corporation, as an entity, may be a plan fiduciary, the analysis does not end there. Individuals within the corporation who exercise the type of authority or control described in section 3(21)(A) of ERISA will themselves be fiduciaries with respect to the Plan.[4]

■ 15. By not appointing any new Plan trustees and by failing to take any action on behalf of the Plan to secure repayment of its notes, Gruman failed to discharge his fiduciary duties with respect to the Plan in the manner required by sections 404(a)(1)(A) and (B). In addition, by not himself taking any steps to provide notice to Plan participants about the impact of the sale, other than providing the meaningless notice to DeKeyser, Gruman also violated

his fiduciary duties for the reasons expressed in Conclusion No. 12, *supra*.

■ 16. After July 2, 1976, Mr. De Keyser retained discretionary authority and responsibility in administration of the Plan and therefore, to that extent, also remained a fiduciary with respect to the Plan. By his own testimony, when he resigned from NWLI and from his position as Plan administrator on August 14, 1976, he was aware that Mr. Gruman had not appointed successor trustees and that Gruman was refusing to cause repayment of the notes held by the Plan in order to meet participants' requests for withdrawals. Although Mr. DeKeyser was aware of these breaches on the part of Mr. Gruman, he failed to take any effective action. Resignation from his own position as a fiduciary is not sufficient to discharge his own duty, under section 405(a)(3) of ERISA, to make reasonable efforts to remedy the breach, see Conference Report at pp. 299–300, 29 CFR § 2509.75–5 at FR–10. Mr. DeKeyser therefore shares co-fiduciary liability for Mr. Gruman's fiduciary breaches.

■ 17. Sections 502(a)(3) and (a)(5) of ERISA, pursuant to which these actions are brought, expressly preserve the authority of the Court to award such equitable relief as is appropriate to redress any fiduciary violations proven in a given case. While only fiduciaries can violate the fiduciary responsibility provisions of Title I of ERISA, it does not follow from that fact that relief may be awarded only against the breaching fiduciaries. In view of the expressed Congressional intent in enacting ERISA "to make applicable the law of trusts", the Court is fully empowered to award the relief available in traditional trust law

---

4. At least after the departure of Mr. DeKeyser, and the failure to designate a replacement, NWLI did become "administrator" of the Plan within the meaning of section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A), and thus, as an entity, became responsible for the various duties which are imposed on that statutorily defined "administrator", see e. g. 29 U.S.C. § 1021(a). However, any individuals who retain discretionary authority or responsibility in the administration are still fiduciaries within the meaning of § 3(21)(A) even if they are not the "administrator" designated in § 3(16)(A). Likewise, the fact that Mr. DeKeyser had the title of Administrator did not limit his fiduciary role to administration of the Plan. Rather, at the least, he shared the "trustee responsibility", see § 405(c)(3), 29 U.S.C. § 1105(c)(3), of management and disposition of the Plan's assets and was therefore also, to that extent, a fiduciary.

against non-fiduciaries who knowingly participate, either directly or through an agent, in a breach of trust.[5]

Under traditional principles of trust law a third party who assisted a trustee in committing a breach of trust could be held liable in an action brought by the beneficiary. Moreover, the trustee and the third party could be joined in a suit for the recovery of the value of the trust property lost on account of the breach. Bogert, *Trusts and Trustees* § 868. The bases for and the elements of third party liability for participation are described as follows:

> Just as every owner of a legal interest has the right that others shall not, without lawful excuse, interfere with his possession or enjoyment of the property or injuriously affect its value, so the cestui, as an equitable owner in the trust res, has the right that third persons shall not knowingly join with the trustee in a breach of trust . . . The wrong of participation in a breach of trust is divided into two elements, namely (1) an act or omission which furthers or completes the breach of trust by the trustee; and (2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge.

> Bogert, *Trusts and Trustees* § 901.

In *Blankenship v. Boyle*, 329 F.Supp. 1089 (D.D.C.1971), a pre-ERISA case, a union and a union-owned bank were held liable as participants in a breach of trust committed by trustees of a Taft-Hartley trust fund. In that case, money was deposited in non-interest bearing checking accounts in the bank and the benefit of the breach was knowingly accepted by the bank and the union. In this case, many of the non-fiduciary defendants furthered the breach and took actions which completed the breach by directly participating with the trustees in the sale transaction in which the breach occurred and by accepting the benefits of the breach. Herman Nemzoff participated personally in the breach; the Slomann family and Olive Hyland participated through their respective agents whose conduct and knowledge is to be attributed to their principals, See Bogert *op. cit.* § 912. The uncontradicted evidence establishes that the sellers were made aware, prior to consummation of the sale, not only facts from which the impending harm to the Plan ought to have been clear, but also of the actually foreseen harm to the Plan. Nevertheless, they continued with the sale. It can safely be said that those active in the sale either personally or through their agents—Nemzoff, the Slomann family, and Olive Hyland—knowingly participated in the seller trustees' breach of trust.[6]

18. Section 409(a) of ERISA, 29 U.S.C. § 1109(a) provides, in part,

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . . .

The old trustees contend that they are relieved from monetary liability first because, they assert, no losses have resulted to the Plan and second, because any losses which resulted did not result from their breaches but from the actions of Gruman. The first of these contentions is difficult to comprehend. Certainly any valuation of the Plan's assets would reflect a diminution in the value of those assets resulting from the fact that the companies in which the Plan invested are bankrupt. More important, the participants in the Plan have directly suffered the loss of being unable to collect their benefits promised by the terms of the Plan, notwithstanding retirement and, in some cases, death. The fact that the Plan

---

5. Indeed, ERISA expressly contemplates a remedy against a non-fiduciary to "correct" a prohibited transaction. See section 2003 of ERISA, 26 U.S.C. § 4975(f)(5) and (h).

6. Thus the Court need not reach the question whether, absent direct knowledge that a breach was occurring, the non-fiduciary sellers were on notice of such facts about a potential breach that they had a duty to inquire further to determine whether the breach was occurring.

has not yet been forced to realize its losses by selling its notes at a discount or cancelling them does not detract in any sense from these very measurable losses already suffered. The possibility that either the Plan or participants might be made whole through other proceedings, including the bankruptcy proceedings, does not require the Court to withhold the remedy provided in these proceedings. The defendants are in no danger of multiple judgments, and equity can resolve any contribution or indemnity to which they may become entitled by virtue of making good the loss to this Plan.

The second contention also deserves response. The loss to the Plan resulted from a number of factors. If the Plan's assets had been invested in some prudent fashion, not wholly tied to the fortunes of the sponsor companies or at least with adequate security, the loss to the Plan would have been little or none. The seller trustees compounded their earlier breaches by entering into the sale which foreseeably resulted in a severe financial weakening of the companies and in prior liens being placed on the very assets to which the Plan was looking for repayment; the subsequent bankruptcy of the companies, the uncollectability of the Plan's notes, and the further depletion of assets by Congress's foreclosure on its security all resulted from the trustees' actions on behalf of the Plan during the sale transaction. The fact that participants were not given adequate notice of the sale resulted in their inability to protect themselves at a time when the Plan and the companies were still solvent. Finally, Gruman's failure to discharge his duty solely in the interests of Plan participants and to honor the terms of the Plan led to the loss, as did the seller trustees' imprudent actions in abandoning the plan to Gruman's management and their failure to take any effective steps to remedy his breaches. In short, the loss to the plan resulted from each of the breaches of trust, and liability on all defendants can be imposed under section 409.

19. Having found that the defendants violated their fiduciary duties, the Court has broad discretion in awarding equitable relief to make the Plan whole, including recovery of monies lost to the Plan. 29 U.S.C. §§ 1109, 1132(a)(2), (3), (5). The guiding principle should be to enforce the remedy which best carries out the purposes of the Plan and is most advantageous to the participants and beneficiaries of the Plan. *Eaves v. Penn, supra.*

20. Section 502(g) of ERISA, 29 U.S.C. § 1132(g), provides:

In any action under this title by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

Certain defendants contend that, if any fee is awarded to attorneys for the private plaintiffs, it should be payable by the Plan rather than by the defendants. They rely on the decision on remand in *Eaves v. Penn,* 244 BNA Pension Rptr. at D–1 (W.D.Okl., March 30, 1979), in which part of the fees owing to attorneys for private plaintiffs was ordered to be paid from the profit sharing plan which was the subject of that action. Unlike that case, the attorneys for private plaintiffs here have not requested a fee award from the Plan, and the Court does not believe that such an award would be justified. As the Court of Appeals for the 10th Circuit noted in reversing the initial fee award against the plan in *Eaves v. Penn,* an award of fees against a plan rather than against a breaching fiduciary is to be the exception, not the rule in cases brought under Title I of ERISA. *Eaves v. Penn, supra,* 587 F.2d at 464 (10th Cir. 1978). Section 502(g) of ERISA demonstrates the Congressional intent that ordinarily in such a case fees and costs should be awarded against the breaching fiduciary and not against the plan which suffered from the breach. Only if equitable considerations exist, of the type enumerated by the Court of Appeals in *Eaves v. Penn,* should the Court exercise its discretion to order an award from the Plan. Here, no such factors exist. While the private plaintiffs' attorneys have gained a benefit for

the Plan as a whole, there is no reason why that benefit should be diminished by a deduction for fees and costs. The defendants are able to pay an award of attorneys' fees. The violations they committed were not technical or unwitting, and an award against them would serve as a deterrent to fiduciaries of other plans who might also be tempted to neglect their responsibilities under ERISA. Therefore, the Court concluded that the fees and costs for the attorneys in the *Freund* action should be paid by the defendants and not by the Plan.

Therefore, IT IS ORDERED THAT:

1. All defendants be removed from serving in any fiduciary capacity with respect to the Plan and that they be enjoined from further violations of ERISA.

2. The defendants be adjudged jointly and severally liable (with the exception of Frank Guth) to restore to the Plan the $464,925.95 amount of the notes, including principal and accrued interest, held by the Plan as of the close of its books on November 26, 1976, plus interest accrued from that day, compounded and adjusted quarterly at the prime rate of the First National Bank of Chicago.[7]

3. A successor trustee be appointed to act as the fiduciary with respect to the Plan.

4. The successor trustee so appointed take possession of all books and records of the Plan and of the Plan's checking account and to accumulate the monies received from defendants pursuant to the Court's Order and distribute them to the participants and beneficiaries of the Plan according to the value of their individual accounts.

5. Attorneys' fees and costs be awarded as follows:

   a) To Richard Bolte, $20,000 in fees and $1,000 in costs, and

   b) To John Potter, $16,000 in fees and $1,000 in costs.

IT IS FURTHER ORDERED THAT:

All counsel submit to the Court within twenty days names of proposed successor trustees.

---

7. The interest rate allowable in equity, like other elements of an equitable recovery, is subject to the discretion of the Court, keeping in mind the objective of putting the plan in the position which it would have occupied but for the breach. Bogert *op. cit.* § 863. Since the prime rate of the First National Bank of Chicago is a fair measure of the cost of money over recent years and is the minimum rate which the plan was earning on its investments, its use is appropriate. In *Marshall v. Kelly, supra*, the court ordered monies repaid with 10% interest which corresponded roughly to interest rates which the Plan had earned on other investments. *See also Royal Indemnity Co. v. United States*, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941); *Austrian v. Williams*, 103 F.Supp. 64 (S.D.N.Y.1952), *rev'd on other grounds*, 198 F.2d 697 (2d Cir., 1952).