Elliet N. ARONSON, et al., Plaintiffs,

v.

SERVUS RUBBER DIVISION OF CHRO-
MALLOY AMERICAN CORPORATION
EMPLOYEES' PROFIT–SHARING
PLAN, et al., Defendants.

Civ. A. No. 82–0177–F.

United States District Court,
D. Massachusetts.

May 19, 1983.

1546

Francis D. Dibble, Jr., Ronald P.W. Weiss, Bulkley, Richardson & Gelinas, Springfield, Mass., for plaintiffs.

Jeffrey McCormick, Robinson, Donovan, Madden & Barry, Springfield, Mass., for defendants.

## MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

FREEDMAN, District Judge.

Plaintiffs brought this action in May 1982 seeking declaratory and injunctive relief. Upon the filing of the verified complaint and a supporting affidavit, plaintiffs applied *ex parte* for a temporary restraining order ("TRO") enjoining the defendants from terminating or distributing the assets of the Servus Rubber Division of Chromalloy American Corporation Employees' Profit-Sharing Plan and Trust. The Court allowed the application and the TRO was entered on May 13, 1982. The TRO was extended upon plaintiffs' application on May 21, and thereafter following plaintiffs' motion for a preliminary injunction, the Court allowed extension upon plaintiffs' application with defendants' assent. On September 2, 1982, the Court allowed plaintiffs' motion to extend the TRO until the entry of a decision on the merits of this case, which motion had also been assented to by defendants.

The Court consolidated the hearing on plaintiffs' motion for preliminary injunction with a trial on the merits. At trial, the parties submitted a detailed stipulation of facts and accompanying set of documents as exhibits. Two witnesses testified for plaintiffs, and one witness testified for defendants. At the close of the evidence, the Court instructed the parties to submit proposed findings of fact and conclusions of law, and upon receipt of these submissions took the case under advisement.

Herein the Court sets forth its Findings of Fact and Conclusions of Law, F.R.Civ.P. 52(a).

## II. FINDINGS OF FACT

A. *Parties*

1. The plaintiffs in this action are Elliet N. Aronson, Lucia B. Browning, Noe Cordeiro, Lawrence Crivelli, Richard Giguere, Robert Goldman, Walter Harubin, Hugo Tietze, and John Zielinski. All nine plaintiffs are former employees of the defendant Chromalloy American Corporation ("Chromalloy"), having worked in the Servus Rubber Division of Chromalloy at its facility in Chicopee, Massachusetts. Further, all nine plaintiffs were participants in the defendant Servus Rubber Division of Chromalloy American Corporation Employees' Profit-Sharing Plan ("the Plan") as of December 31, 1980.

2. The defendant Plan is a profit-sharing plan as defined in Section 401(a) of the Internal Revenue Code of 1954, as amended, and the regulations promulgated thereunder and is an employee benefit plan as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(2). The Servus Rubber Division of Chromalloy American Corporation Employees' Profit-Sharing Trust ("the Trust") was established pursuant to the Plan.

3. The defendant Chromalloy is a Delaware Corporation with its principal place of business at Chromalloy Plaza, 120 South Central Avenue, St. Louis, Missouri. Chromalloy, acting through its Servus Rubber Division ("Servus") was at all times pertinent to this action Administrator of the Plan until May 14, 1982.

4. The defendant Donald Tobin was a Trustee for the Plan and President of Servus until May 14, 1982, with his office located at 1136 Second Street, Rock Island, Illinois. The defendant John Caruso was a Trustee for the Plan and Vice-President of Servus until May 14, 1982, with offices located at 1136 Second Street, Rock Island, Illinois.

B. *The Plan and Trust*

5. The Plan stated in its introductory section that its purpose was "to provide additional incentive and retirement security for eligible employees ... by permitting them to share in the profits of the Company." Section 3.5 of the Plan provided *inter alia* that "[e]very Employee who becomes a

Participant shall [subject to conditions not relevant here] continue as a Participant in the Plan until his death, termination of employment, or retirement."

6. Section 4.1 of the Plan obliged Chromalloy to make a contribution to the Plan only out of the net profits of Servus for that year, or out of accumulated earnings and profits of prior years. However, defendant Caruso testified that as a matter of practice, Chromalloy made contributions irrespective of the profitability of Servus in any particular year. Contributions to the Plan were allocated *pro rata* to each participant in the Plan based on the compensation of each participant for the year in question. Plan, Section 4.5. The allocation formula was succinctly set forth in a Summary Plan Description as follows:

> Your share is determined by dividing your compensation (excluding bonuses and 35% of the compensation to salesmen, less bonuses) during the plan year by the total compensation (excluding bonuses and 35% of the compensation to salesmen, less bonuses) of all participants and multiplying the result by the company's contributions.

Summary Plan Description at p. 5.

7. The Plan in Section 2.1(g) defined its accounting date as "12/31" (December 31) and in Section 5.2(b) provided that each year's contributions would be allocated and credited to each participant's account on the accounting date. The Summary Plan Description stated:

> Company contributions are divided among members of the plan who are with the company on December 31 of the year for which the contribution is made. You must be employed on December 31 to receive any part of the company contribution for the plan year ending on that date.

Summary Plan Description at p. 5.

8. Section 12.1 of the Plan provided in part as follows:

> The Company, with the approval of the Pension Committee of Chromalloy American Corporation, reserves the right to terminate the Plan and Trust, or to discontinue completely Company contributions, by giving written notice of the date of such termination or discontinuance . . . to the Trustee.

Section 12.2 stated that:

> Upon the partial or complete termination of the Plan or Trust, or in the event of complete discontinuance of the Company's contributions, the date thereof being called the "Date of Termination," each participant affected by the partial or complete termination shall be entitled to one hundred per cent of his account in Trust anything hereinabove to the contrary notwithstanding, determined on the Date of Termination as if such date were an Accounting Date.

9. The Plan reserved the right in Servus to amend the Plan at any time by written resolution of the Pension Committee of Chromalloy Corporation, "including but not limited to, the right to change the amount or method of determining Company contributions," Plan, Section 11.3, and provided that "[a]ny amendment may, by its terms, be retroactive. Each amendment and the retroactive application thereof, if any, shall become effective upon delivery to the Trustee of a written instrument executed by the Company, setting forth the terms and provisions thereof." *Id.* In like fashion, Section 10.1 of the Trust provided that "The Company, by resolution of the Pension Committee of Chromalloy American Corporation, reserves the right to amend the Plan or Trust at any time, and from time to time. . . . Each amendment and the retroactive effect thereof, if any, shall become effective upon delivery of a written instrument setting forth its terms and provisions, and executed by the appropriate representatives of the Company, to the Trustee."

### C. *Servus*

10. Prior to being acquired by Chromalloy in 1970 and becoming a division thereof, Servus was an independent corporation with a principal place of business in Rock Island, Illinois. As of December 30, 1980, Chromalloy operated two manufacturing facilities as part of Servus: one facility was

located at 1195 Montgomery Street, Chicopee, Massachusetts; and the other at 1136 Second Street, Rock Island, Illinois. Servus manufactured and sold footwear, most notably boots. The Chicopee facility manufactured and sold vinyl products, primarily winter boots for the consumer market, but some boots suited to industrial use were also made there. The Rock Island facility made and marketed a variety of rubber boots including heavyweight boots suited to industrial, firefighting, and sporting applications. Because the Chicopee facility manufactured and sold vinyl products, it was commonly referred to as Servus Vinyl Division. However, the two facilities were not separate business entities, but were rather two components of the single division Servus within Chromalloy.

11. Servus ran sales operations at both facilities, and sales personnel at the Rock Island facility sold products manufactured at the Chicopee facility. The 1981 sales catalog of the Rock Island facility advertised products manufactured in Chicopee. Payroll checks for employees at the Chicopee facility were computed at the Chicopee facility but were obtained from the Rock Island facility, drawn on the First National Bank of Rock Island, and bore the address of the Rock Island facility and the facsimile signature of John Caruso. During the end of the year 1981, payroll functions were managed entirely from the Rock Island facility.

12. Plaintiff Aronson was Executive Vice-President of Servus and his duties required that he occasionally travel to the Rock Island facility.

13. There were 168 participants in the Plan on December 31, 1980, of whom 93 were employed at the Rock Island facility, and 75 were employed at the Chicopee facility. As noted previously, each of the plaintiffs was an employee of Chromalloy at the Chicopee facility and a participant in the Plan on December 31, 1980.

D. *Sale of Chicopee Facility*

14. In its 1980 Annual Report, Chromalloy expressed its intent to continue a general program of divestiture to strengthen its financial position. This disclosure of intent comported with divestiture plans about which plaintiff Aronson had been informed by defendant Tobin and executives of Chromalloy's Consumer Products Groups, specifically, that Chromalloy planned to divest itself of Servus as part of a divestiture of its Consumer Products Group. Aronson expressed to Chromalloy personnel his interest in acquiring the Chicopee facility, but Chromalloy personnel indicated that the Chromalloy desired to sell both the Rock Island and Chicopee facilities together. Nonetheless, on August 28, 1981, Chromalloy sold a substantial part of its assets in the Chicopee facility of Servus to Preview Products of Manchester, New Hampshire. Aronson and other executive personnel at the Chicopee facility were informed of the sale by Tobin on August 29. Tobin advised Aronson to report to work on the following Monday to begin actual shut down procedures at the Chicopee facility.

15. On August 31, 1981, departmental managers and the union representative were informed of the sale and instructed that the facility would be closed and layoffs would begin immediately. In the course of the next ten days, work in progress was completed.

16. There were approximately 350 employees at the Chicopee facility on August 29, 1981, most of whom were union employees not covered by the Plan. Of the 68 non-union personnel employed at the Chicopee facility on that date, 64 were participants in the Plan. By September 30, 1981, 29 non-union employees remained, of whom 27 were participants in the Plan. As of October 31, 1981, 22 non-union employees remained; on November 30, 1981, 18 non-union employees remained; and on December 31, 1981, 11 non-union persons were employed at the Chicopee facility. In contrast, on September 30, 1981, 83 non-union persons were employed at the Rock Island facility, 72 of whom were participants in the Plan, and on December 31, 1981, 84 non-union persons were employed there, of whom 71 were participants in the Plan.

17. Each of the plaintiffs was employed at the Chicopee facility on December 31, 1981 and had been employed there for the entire year 1981. Each plaintiff was physically present and working at the facility on December 31, 1981. The employment of plaintiffs Aronson, Giguere, and Harubin terminated on January 1, 1982. The employment of plaintiffs Browning, Cordeiro, Crivelli, Goldman, Tietze, and Zielinski ended on January 8, 1982.

18. During the shut down procedures of the Chicopee facility during September through December 1981, Tim Evans, Controller of Chromalloy's Industrial Products Group, visited the Chicopee facility almost weekly from his principal office in St. Louis, Missouri, to oversee the closing of the facility. While Evans and Aronson discussed periodically which employees should remain, Evans had the final decision on this and other matters involved in the shut down of the facility.

19. Employees at the Chicopee facility received severance pay equal to one week of current salary for each year employed. Aronson testified that Evans stated during the shut down period that a condition of receiving this severance benefit was that an employee not leave his or her employment before Chromalloy determined that the employee's services were no longer needed.

### E. Compensation of Plaintiffs in 1981

21. The individual plaintiffs received compensation, as defined in Section 2.1(w) of the Plan, during the year 1981 as follows:

| | |
|---|---|
| Elliet N. Aronson | $65,524.56 |
| Lucia B. Browning | 11,700.00 |
| Noe Cordeiro | 14,031.24 |
| Lawrence Crivelli | 23,400.00 |
| Richard Giguere | 18,922.53 |
| Robert Goldman | 21,308.26 |
| Walter Harubin | 23,000.12 |
| Hugo Tietze | 17,136.60 |
| John Zielinski | 17,072.89 |

The following amounts were paid to two of the plaintiffs on account of vacation time accrued during 1981:

| | |
|---|---|
| Elliet N. Aronson | $5,673.13 |
| Lawrence Crivelli | 900.00 |

As a matter of practice, amounts paid for vacation time accrued were included in calculating total compensation of an individual participant under the Plan.

### F. Discussions Concerning Contributions, Communications with the Internal Revenue Service, and Resolution of the Pension Committee of Chromalloy

22. During the period September through December 1981, plaintiff Aronson had numerous conversations with different employees of Chromalloy concerning the Plan and what participants in the Plan might be receiving as a contribution at the end of the year 1981. Aronson discussed the subject on numerous occasions with defendant Trustees Caruso and Tobin, with Tim Evans, and with Alistair W. Clubb, Vice-President of Personnel and Administration, and expressed his belief that persons who were participants in the Plan and who worked through the end of the year 1981 at the Chicopee facility should receive their *pro rata* allocated share of any contribution made to the Plan. No one among the personnel with whom Aronson discussed the subject indicated that any participant employed at the Chicopee facility would share in any contribution. Rather, the Trustees Tobin and Caruso indicated that the matter was not in their hands; Evans stated that a decision had been made that Chicopee employees would not share in any contribution; and Clubb, in November 1981 answered Aronson's telephonic inquiry by stating that application had been made to the Internal Revenue Service ("IRS") for a partial termination of the Plan. Sometime subsequent to August 28, 1981, the participants in the Plan employed at the Chicopee facility, including each of the plaintiffs, received a letter from Chromalloy signed by defendants Tobin and Caruso in their capacities as President and Vice-President of Finance, respectively, of Servus. The undated letter stated in pertinent part as follows:

The decision has been made to terminate the Servus Rubber Profit-Sharing Plan as it relates to those participants at the Chicopee facility and to distribute the funds attributable to those participants.

An application is to be made to the Internal Revenue Service for a determination

on this partial plan termination. Normally, the IRS review of a plan termination is completed in 90–120 days. Upon receipt of IRS approval, the Plan Trustees will take immediate action to distribute the account balances to these Chicopee participants.

23. Chromalloy did in fact submit an Application for Determination Upon Termination to the IRS on November 12, 1981. This Application did not specifically indicate that the termination would be "partial" or that the Plan would continue in existence. The Application set forth a termination date of September 30, 1981, and in answer to the printed inquiry "Reason For Termination" stated "Plant Liquidation." There was no indication that employees in Servus would continue to be employed beyond the Plan year end of December 31, 1981.

24. The Pension Committee of Chromalloy, which was made up of three non-Servus employees of Chromalloy, adopted the following resolution on November 25, 1981:

> Resolved, that the Servus Rubber Division of Chromalloy American Corporation Employee's Profit-Sharing Plan be partially terminated with respect to those participants who were employees of the Servus Vinyl Division at the date of the announcement to close down that operation with the date of termination and valuation, as defined in the plan, be established as September 30, 1981. . . .

This resolution was one of many resolutions adopted by the committee concerning various plans and trusts covering divisions within Chromalloy.

25. Chromalloy received from the IRS a determination letter with respect to the Plan dated January 21, 1982, which stated in pertinent part as follows:

> We have considered the information you sent us and have determined that your termination of this plan does not adversely affect its qualification for federal tax purposes. Please note that this is not a determination regarding the effect of other federal or local statutes.

### G. Contributions and Trust Assets

26. Chromalloy made a contribution in the amount of $112,075.44 under the Plan on behalf of participants in the Plan employed at the Rock Island facility on December 31, 1981; this contribution was equal to eight percent (8%) of a computation in accordance with the Plan based on the compensation of each such participant. No allocation of this contribution and no other contribution has been made on behalf of any of the plaintiffs or on behalf of any other person employed by Chromalloy at the Chicopee facility on December 31, 1981.

27. The assets of the Trust were $1,009,-793.00 on September 30, 1981 and were $1,171,215.75 in December 1981.

### H. Letters to Aronson and Crivelli

28. On or about March 1, 1981 plaintiff Aronson received a letter dated February 27, 1981 signed by the defendant Tobin in his capacity as President of Servus. The letter discussed the possibility of divestiture, Chromalloy's concern that the operations of Servus remain as efficient and profitable as possible until divestiture might be completed, and the need for key personnel to remain in place. The letter stated in pertinent part as follows:

> In an effort to alleviate your major concern, Chromalloy will assure the individual who remains and functions in his position up to the point of a completed divestiture, that he will be granted the following considerations:
>
> 1. All reasonable efforts will be made to secure his continuing employment with the purchaser.
>
> 2. If through no fault of his own his position is lost due to the divestiture, then Chromalloy would guarantee him up to twelve (12) months of salary and fringe benefits to cover a period sufficient to regain a similar new position.
>
> 3. Once re-employment occurs, the severance payments would cease.
>
> 4. If he accepts a position at a salary lower than that paid to him at Chromalloy, the difference would be paid by Chro-

malloy for the remaining balance of the twelve-month period.

29. On or about March 1, 1981, plaintiff Crivelli received a letter dated February 27, 1981 from Chromalloy signed by defendant Tobin in his capacity as President of Servus. This letter was similar to the letter to Aronson, except the guarantee of salary and fringe benefits was for a period of six months. Subsequently, on or about October 29, 1981, Crivelli received a letter dated October 27, 1981, from Chromalloy signed by Tim Evans in his capacity as Controller of Chromalloy's Industrial Products Group. This letter amended the February 27 letter to Crivelli "with reference to severance pay," and stated that "[t]his amendment will guarantee you six months of salary upon the completion of the liquidation of the Servus Vinyl Division regardless of future employment."

30. Plaintiff Aronson as of November 1982 had been unemployed since the termination of his employment by Chromalloy.

I. *Miscellaneous*

31. On May 14, 1982, counsel for plaintiffs caused a copy of the complaint in this action to be served upon the Secretary of Labor and upon the Secretary of Treasury by certified mail, return receipt requested.

### III. CONCLUSIONS OF LAW

1. Subject matter jurisdiction lies pursuant to the jurisdictional provisions of ERISA, 29 U.S.C. § 1132(e), (f). Plaintiffs have complied with the service requirements of 29 U.S.C. § 1132(h), and venue is proper in this district. *Id.,* § 1132(e)(2), *Varsic v. United States District Court for the Central District of California,* 607 F.2d 245, 248 (9th Cir.1979). To the extent plaintiffs Aronson and Crivelli advance non-ERISA claims, subject matter jurisdiction exists under the principles of pendent jurisdiction.

2. ERISA provides that "a civil action may be brought (1) by a participant ... (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan"; 29 U.S.C. § 1132(a)(1)(B), and "by a

participant ... (A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan ...," *id.,* § 1132(a)(3). The plaintiffs are within ERISA's definition of "participants," 29 U.S.C. § 1002(7), and allege that the defendants have failed to pay benefits due plaintiffs, and have violated the terms of ERISA and the Plan. The Plan is an "employee pension benefit plan" within the meaning definition of ERISA, 29 U.S.C. § 1002(2), to which the provisions of ERISA apply. 29 U.S.C. § 1003(a)(1). The defendant Chromalloy as administrator of the Plan, 29 U.S.C. § 1002(16), and the defendant trustees Tobin and Caruso are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). *See also Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 635 (W.D. Wis.1979).

3. ERISA requires that:

A fiduciary shall discharge his duties with respect to a plan solely in the interests of participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) . . . .

(C) . . . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [the provisions of ERISA].

29 U.S.C. § 1104(a)(1).

4. ERISA further provides that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, [or] ERISA, ..., or for the purpose of interfering with the attainment of any right to which

such participant may become entitled under the plan, [or ERISA] . . . .

29 U.S.C. § 1140.

5. Plaintiffs advance three distinct theories of recovery, two of which support the claims of all nine plaintiffs, and one of which suggests a separate contractual right to "fringe benefits"—including profit-sharing plan benefits—on the part of plaintiffs Aronson and Crivelli. The two ERISA claims may be summarized as follows: first, that the Resolution adopted by the Pension Committee of Chromalloy purporting to terminate partially the Plan and establish a valuation date of September 30, 1981 as to the participants at the Chicopee facility was ineffective; second, that even if the Resolution was effective, such termination and establishment of a new accounting date unlawfully discriminated against plaintiffs as participants in the Plan employed at the Chicopee facility on December 31, 1981.

6. Defendants contend that the partial termination and establishment of a valuation date of September 30, 1981 were undertaken in accordance with the terms of the Plan and effective as a retroactive partial termination, "by appropriate amendment or otherwise . . . ." Defendant's Post-Trial Memorandum at 14. Further, defendants argue that the plaintiffs' evidence fails to establish discrimination against plaintiffs. Finally, defendants urge that the term "fringe benefits" as used in the letters to Crivelli and Aronson cannot be construed to incorporate profit sharing plan contributions.

■ 7. Turning first to plaintiffs' contentions concerning the ineffectiveness of the Resolution, the Court notes that the Resolution on its face makes no specific mention of amending the Plan. Further, while defendants correctly point out that the Plan in Section 11.3 allows for the retroactive effect of amendments, that same section states that: "Each amendment and the retroactive application thereof, if any, shall become effective upon delivery to the Trustee of a written instrument executed by the Company, setting forth the terms and provisions thereof." There is no evidence that this amendment procedure was followed in this case. Indeed, although defendants contend that notice, apparently of some sort, to the Trustees must have taken place because not only did defendant Caruso sign the Application for Determination Upon Termination submitted to the IRS, but also both Trustees (Caruso and Tobin) signed the letter sent to all participants employed at the Chicopee facility, nonetheless it is manifest that the Resolution of the Pension Committee of Chromalloy made no reference to which particular sections of the Plan were being amended by deletion and insertion. Under these circumstances, the Court concludes that the Resolution of the Pension Committee of Chromalloy dated November 25, 1981, cannot be construed as an effective amendment to the Plan.

■ 8. Defendants argue that Section 12.1 of the Plan authorized termination without the need for amendment. While Section 12.2 of the Plan as amended effective January 1, 1976, makes reference to partial termination in the context of each participant's entitlement to one hundred percent of his account in trust upon the date of termination as if it were an accounting date, the specific termination provisions set forth in Section 12.1 of the Plan refer to the right reserved to Servus with the approval of the Pension Committee of Chromalloy and written notice of the termination to the Trustee to terminate the Plan and the Trust. Although defendants correctly point out that the Plan and Trust could have been terminated completely, if accomplished in accordance with the Plan's provisions, it does not follow as defendants suggest that the Pension Committee of Chromalloy by Resolution could partially terminate the Plan in 1981 so long as requisite minimum participation standards were not violated. The Plan makes no reference to partial termination of the Plan with respect to some employees but not others, and even if the right to terminate partially were implicit in the reserved right to terminate completely, still the Plan does not provide for either complete or partial termination to be effective merely by resolution of the Pension Committee of Chromalloy.

9. Defendants cite tax regulations concerning termination of plans qualified under the Internal Revenue Code in support of their position that the partial termination was effective. These regulations provide in part as follows:

(b) *Termination defined.* (1) Whether a plan is terminated is generally a question to be determined with regard to all the facts and circumstances in a particular case. For example, a plan is terminated when, in connection with the winding up of the employer's trade or business, the employer begins to discharge his employees....

26 C.F.R. § 1.401–6(b)(1);

(2) For purposes of this section [26 C.F.R. § 1.401–6], the term "termination" includes both a partial termination and a complete termination of a plan. Whether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded from such coverage either by reason of an amendment to the plan, or by reason of being discharged by the employer will be determined on the basis of all the facts and circumstances. Similarly, whether or not a partial termination occurs when benefits or employee contributions are reduced, or the eligibility or vesting requirements under the plan are made less liberal, will be determined on the basis of all facts and circumstances....

*Id.,* § 1.401–6(b)(2). Defendants refer to a series Revenue Rulings applying these regulations, the most analogous of which is Rev.Rul. 81–27, 1981–4 I.R.B. 12 (superseding Rev.Rul. 72–510). The facts in this ruling involved an employer who had "established a qualified defined benefit plan that covered employees in the two divisions of its business. At a time when the plan covered 165 employees, the employer closed down one division. In connection therewith, the services of 95 participants were terminated." *Id.* On the facts presented, the IRS ruled as follows:

In this case, a significant number of employees who had been covered under the employer's pension plan were discharged in connection with the winding up of a part of the employer's business.

Accordingly, there was a partial termination of the plan within the meaning of Section 411(d)(3) of the [Internal Revenue] Code [26 U.S.C. § 411(d)(3)].

This holding would apply irrespective of whether the significant decrease in participation in the plan was the result of adverse economic conditions or causes within the control of the employer.

*Id.*

10. Defendants argue that "[b]ased on the above-mentioned regulations, the pertinent sections of the Internal Revenue Code, and the interpretations of the above found within the pertinent Revenue Rulings, it is clear that a partial termination of a plan will occur merely if a significant number or percentage of employees are excluded from participation in the plan by reason of discharge of employment, without the need for amendment of the plan.... Thus, a partial termination of a plan can in fact take place even though all of the participants are not discharged." Defendants' Post-Trial Memorandum at 8–9.

■ 11. However, defendants' reliance on the cited provisions of the Internal Revenue Code, the regulations promulgated thereunder, and the Revenue Rulings is misplaced. An effective partial termination cannot be said to have occurred in this case merely because tax law governing qualified plans requires that upon partial termination "the rights of all affected employees to benefits accrued to the date of such ... partial termination ..., to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable." 26 U.S.C. § 411(d)(3). Nothing in the statute, regulations, or interpretative rulings requires that partial termination of a plan due to the discharge of a significant number of employees be extended to employees who actually continue to be employed well beyond the date of partial termination, especially where that date and an attendant accounting or valuation date are established retroactively. While the cited law suggests that

the exclusion of participants who continue to be employed after a significant number of employees have been discharged might lawfully be accomplished by appropriate amendment to a plan, the Court has determined that no such amendment occurred here.

12. Further, the determination of the IRS in response to the application submitted does not foreclose plaintiffs' recovery. The determination letter of February 15, 1982 itself expressly limits the scope of its ruling, and given the very limited information submitted to the IRS in connection with the Application for Determination Upon Termination, the IRS letter can hardly be considered a definitive administrative ruling entitled to judicial deference.

13. Thus, the Court concludes that no partial termination of the Plan took place with respect to the nine plaintiffs until the termination of their individual employment on January 1 or 8, 1982. Since plaintiffs were employed on December 31, 1981, they were entitled under the Plan's terms as participants to a contribution or an allocation of a contribution on their behalfs on December 31, 1981 on the same *pro rata* basis as other participants. The failure of defendants to make such contribution or allocation of contribution violated the terms of the Plan and thus their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (D).

14. Alternatively, the Court concludes that even if the Resolution of the Revision Committee of Chromalloy could be construed to have amended the Plan effectively, nevertheless the exclusion of plaintiffs from participation in the Plan for purposes of the contribution for 1981 constituted discrimination against plaintiffs for the purpose of interfering with the attainment of plaintiffs' rights as participants in the Plan in violation of 29 U.S.C. § 1140. Defendants have offered no cogent justification for terminating plaintiffs' participation in the Plan prior to their actual termination from employment, and while plaintiffs were essentially performing services in connection with the winding up of the Chicopee facility, nonetheless all nine plaintiffs were still contributing to the efficient operation of Servus in Chromalloy and were physically present and working on December 31, 1982.

15. The contract claims of plaintiffs Aronson and Crivelli are more difficult, however. Given the Court's conclusion concerning plaintiffs' claims under ERISA, the claim of Crivelli is of no consequence. However, since Aronson was employed on January 1, 1981 and the February 27 letter to Aronson from Chromalloy guaranteed salary and fringe benefits for up to twelve months following termination of his employment, his contract claim could extend to any contribution accruing on the December 31, 1982 accounting, if he remained unemployed on that date.

16. Of course, by December 31, 1982, Aronson was no longer employed by Servus in Chromalloy and therefore would not be entitled to participate under the terms of the Plan. Aronson contends that the term "fringe benefits" as used in the February 27 letter must be understood as it would be in common parlance, that is, to include usual contributions to a profit-sharing plan. Defendant Chromalloy, on the other hand, argues that Aronson has failed to prove by a preponderance of the evidence that the term "fringe benefits" was intended to include any contribution under the Plan.

17. Problematically, defendant has not shown to what benefits the term "fringe benefits" could have referred besides retirement benefits, although the Court might infer that there were other such benefits given Aronson's position as Vice-President. Defendant does point out that personnel of Chromalloy continually in November 1981 expressed no intent to make contribution on behalf of employees of the Chicopee facility, and since no contribution would be made on behalf of Aronson as such an employee, this expression of intent generally is at least some evidence that the term "fringe benefits" was not intended to extend to contribution under the Plan. Furthermore, the evidence adduced is certainly insufficient to support promissory estoppel.

18. However, the Court is unable to conclude that the term "fringe benefits" as used in the February 27 letter to Aronson meant something other than the ordinary meaning of the term. Clearly, retirement benefits are within the ambit of the plain meaning of the term "fringe benefits," and the evidence of the statements of Chromalloy personnel made in light of subsequent events cannot be viewed as altering that plain meaning. Therefore, the Court concludes that Chromalloy obligated itself to continue fringe benefits to Aronson for a period of one year from his termination of employment by Chromalloy. While the remedy for ERISA violations to be ordered by the Court subsumes any contribution for 1981 to which Aronson was contractually entitled, Aronson, if he did not commence new employment as of December 31, 1982, may further recover from defendant Chromalloy an amount equal after taxes to his allocation—as if he were a participant in the Plan—of the employer's 1982 contribution to the Plan, if any.

19. With respect to all nine plaintiffs, the Court under ERISA may fashion "appropriate equitable relief" to remedy the failure of the fiduciaries to comply with the terms of the Plan and the dictates of ERISA. 29 U.S.C. § 1109(a). Quite clearly, under the facts of this case, the fiduciaries, and not the Plan itself, should be held liable for the losses resulting to plaintiffs. 29 U.S.C. § 1109(a) provides that "a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses resulting from such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate...." *Id.* Because each of the defendant fiduciaries had knowledge of the exclusion of plaintiffs from participation in the Plan and failed to make efforts to remedy that breach, each and all of the fiduciaries may be held liable for the breach of fiduciary duty of any of the fiduciaries. 29 U.S.C. § 1105(a)(3).

20. However, in this case, it was the defendant Chromalloy which directly benefitted from the failure to make a con-

tribution on behalf of plaintiffs for the year 1981, and the Court by no means has determined that the actions of the defendant trustees Tobin and Caruso amounted to "gross negligence" or "willful misconduct." While the issue is not specifically before the Court, the Court does note that the indemnification provisions of the Plan, Section 10.4, and the Trust, Sections 7.1, 7.2, would appear to apply to the instant facts such that the defendant Chromalloy should bear the burden of providing the relief to be ordered by the Court. Indeed, as was observed in *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis.1979), "[r]ights of contribution and indemnity between or among breaching fiduciaries are within the equitable discretion of the Court, and may be granted, as just, under the facts of the case." *Id.* at 635, n. 1, *citing* Bogert, Trusts and Trustees § 862, p. 24. For these reasons, the Court will direct that the monetary relief ordered be borne by the defendant Chromalloy.

21. Plaintiffs are entitled to a remedy making them whole for losses resulting from the failure of defendants to make a contribution to the Plan on their behalf as participants for the year 1981. Plaintiffs point out that under applicable tax law, monies due the plaintiff under the Plan are taxable to the plaintiffs only to the extent such funds are actually distributed to them. 26 U.S.C. § 402(a)(1), and that individual tax liability for distributions from the Plan may be deferred by a rollover of such distributions into a qualified trust or retirement plan, *id.,* § 402(a)(5), or taxed at more favorable rates than ordinary income generally. *Id.,* § 402(e). Consequently, an outright payment by defendants to plaintiffs sufficient to restore plaintiffs could well be substantially larger than a contribution to the Plan with subsequent allocation and distribution, and, in any event, calculation of such an outright payment would be difficult given the varying tax positions of each of the plaintiffs.

22. The Court will therefore order the following relief: first, that with respect to the plaintiffs, the November 26, 1981 reso-

lution of the Pension Committee of Chromalloy purporting to terminate partially the Plan effective September 30, 1981 and the accounting based thereon be declared void; second, that defendant Chromalloy contribute to the Trust an amount equal to 8% (eight percent) of the total compensation earned by the plaintiffs in 1981, including the amounts paid Aronson and Crivelli for vacation time accrued during 1981, to be allocated among the plaintiffs' accounts under the Plan, effective December 31, 1981 in proportion to their respective 1981 compensation, again including the amounts paid Aronson and Crivelli for vacation time accrued in 1981; third, that there be an accounting of the account balances of the plaintiffs in the Plan as of December 31, 1981, and that defendant Chromalloy further contribute to the Trust an amount to be allocated among the plaintiffs in proportion to their respective account balances as of December 31, 1981, equal to the interest on such account balances at the prime rate of the First National Bank of Chicago, Chicago, Illinois (*see* Plan, Section 6.1(b)), from December 31, 1981, until the date such contribution is actually made; and fourth, that the Trustees of the Trust distribute to the plaintiffs within ten days after such contributions are made an amount equal to their respective account balances in the Plan less the amounts actually received by the plaintiffs in prior distributions from the Trust.

23. Plaintiffs have requested an award of punitive damages. As defendants contend, however, there is a substantial question as to whether punitive damages may be awarded under ERISA. *Compare Baeten v. VanEss,* 474 F.Supp. 1324, 1331 (E.D.Wis.1979) (*dicta* to the effect that punitive damages may be warranted as an appropriate and necessary sanction in "extreme cases"), with *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1216–17 (8th Cir.1981) and cases cited therein (punitive damages inappropriate in action under ERISA). Without entering the fray of conflicting views, however, the Court determines that an award of punitive damages, even if available under ERISA, is unwarranted on the facts of this case.

24. 29 U.S.C. § 1132(g)(1) provides that in any action brought by a participant the Court may allow a reasonable attorney's fee and costs of action to either party. *Id.* The Court determines that this is an appropriate case for an award of fees and costs, and any such award should be paid by the defendant Chromalloy. The Court will order the parties to attempt to reach an agreement concerning costs and attorney's fees within forty-five days of the date of the Court's Order, and if no agreement can be reached, the Court will thereafter receive materials germane to the issue of costs and fees from the parties and enter an order accordingly.

## CONCLUSION

For the reasons stated herein, the Court concludes that the defendant fiduciaries breached the terms of the Plan and violated the provisions of ERISA such that plaintiffs are entitled to appropriate equitable relief. Additionally, plaintiff Aronson is entitled to recover in contract. An award of punitive damages is unwarranted, and the parties shall attempt to negotiate a settlement of costs and attorney's fees, and absent a settlement, the Court shall take up the matter subsequently.

Order Accordingly.

## ORDER

FREEDMAN, District Judge.

In accordance with the Memorandum, Findings of Fact, and Conclusions of Law entered by the Court this date, it is hereby Ordered:

A. That the November 25, 1981 resolution of the Pension Committee of Chromalloy American Corporation and the accounting based thereon be declared void;

B. That Chromalloy American Corporation contribute to the Servus Rubber Division of Chromalloy American Corporation Employees' Profit-Sharing Trust ("the Trust") an amount equal to 8% of the total compensation paid to the plaintiffs for the year

1981, including amounts paid to plaintiffs Aronson and Crivelli for vacation time accrued during 1981, to be allocated among plaintiffs' accounts under the Servus Rubber Division of Chromalloy American Corporation Employees' Profit-Sharing Plan ("the Plan"), in proportion to their respective 1981 compensation, including amounts paid to plaintiffs Aronson and Crivelli for vacation time accrued during 1981;

C.  That there be an accounting of the account balances of the plaintiffs in the Plan as of December 31, 1981, and that Chromalloy American Corporation further contribute to the Trust an amount to be allocated among the plaintiffs in proportion to their respective account balances as of December 31, 1981, equal to the interest on such account balances at the prime rate of the First National Bank of Chicago, Chicago, Illinois, from December 31, 1981, until the date such contribution is actually made;

D.  That the Trustees of the Trust distribute to the plaintiffs within ten days after such contributions are made an amount equal to their respective account balances less the amounts actually received by the plaintiffs in prior distributions from the Trust;

E.  That Chromalloy American Corporation pay to plaintiff Aronson an amount equal after taxes to his allocation, as if he were a participant in the Plan, of the employer's 1982 contribution to the Plan, if any; and

F.  That the parties attempt to reach an agreement concerning costs and attorney's fees for the plaintiffs within forty-five days of this Order; if no such agreement can be reached, the Court will thereafter receive materials germane to the issue of costs and attorney's fees from the parties and after making its own determination, enter an appropriate order.

It is so Ordered.