In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1444

SIMON PROPERTY GROUP, L.P.,
a Delaware limited partnership,

Plaintiff-Appellant,

v.

mySIMON, INC., a California
corporation,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 99-1195-C H/G--David F. Hamilton, Judge.

Argued February 14, 2002--Decided March 13, 2002

Before FLAUM, Chief Judge, and BAUER and EVANS, Circuit Judges.

EVANS, Circuit Judge.  Simon Property Group attempts to appeal from the district court's decision effectively staying the issuance of an injunction it will issue when a final judgment is entered. mySimon argues that we lack jurisdiction because the district court's decision is not an order "granting . . . or refusing" an injunction under 28 U.S.C. sec. 1292(a)(1).

Simon Property Group (SPG) is an Indianapolis-based real estate investment trust that owns and manages retail real estate, primarily shopping malls, in 36 states. SPG has been in the real estate business for more than 40 years, but it has operated under several different names after being founded as Melvin Simon and Associates. In 1993 the company went public and became Simon Property Group. Three years later it merged with DeBartolo Realty Corporation and became the Simon DeBartolo Group. In 1998 the name changed back to Simon Property Group. SPG is the largest retail real estate investment trust in the United States. Unlike mySimon, it does not offer comparison shopping services on the Internet. The only products SPG sells on

the Internet are a relatively small number of shopping mall gift certificates.

In early 1998 Michael Yang and Yeogirl Yun (we'll refer to both, and other colleagues like Lynn Gately, simply as "Yang") founded a company to provide comparison shopping via the Internet. As a youth, Yang must have had permission to take a lot of giant and scissor steps, because he decided on "Simon" as a name for his company, based on the childhood game "Simon Says."

Yang was interested in using the Internet domain name "simon.com" but it belonged to SPG (which was then known as Simon DeBartolo). SPG was not interested in selling the domain name. Therefore, Yang began searching for new names, hitting upon mySimon. Yang liked the name because it suggested a personalized shopping experience and because his initials were M.Y. After learning that the Internet domain name mysimon.com was not taken, Yang moved forward with plans to call the company mySimon.

Although SPG was not interested in selling its domain name to Yang's company, SPG executives did express an interest in mySimon as a potential partner or investment opportunity. Yang and Andrew Halliday, who was co-president of SPG's strategic business unit, Simon Brand Ventures, discussed this possibility, but nothing materialized. When Yang spoke with Halliday, mySimon had not yet been incorporated, nor had Yang done a trademark search on the mySimon name. Therefore, Yang's communications with SPG referred to mySimon as his company's "temporary" name. Halliday testified that he told Yang that he should choose a different name for mySimon to avoid using the "Simon" name.

mySimon launched its Web site and began a national advertising campaign in October 1998. By the summer of 1999 it had spent millions of dollars on advertising and had attained national recognition.

In March 1999, 6 months after mySimon's launch, SPG launched a corporate "branding" campaign to inform consumers that it owned and managed certain shopping malls, something it had not done

in its 40 years of existence. According to Karen Corsaro, former president of Simon Brand Ventures, no other American property management company had ever attempted to "brand" any of its shopping malls. Not surprisingly, the branding campaign had its work cut out for it. According to SPG's annual report for 1999, a 1997 survey showed that only 3 percent of shoppers were aware of SPG's "Simon" name. The annual report for 1998 said, "There is much work to be done as research shows shoppers do not have the proper awareness of the added value that a Simon-managed shopping center can deliver." SPG's advertising agency reported that brand recognition for the "Simon" name was "almost nonexistent" before 1999. In an attempt to raise consumer awareness, SPG spent $90 million on advertising in 1999. According to SPG's annual report for 1999, the branding campaign increased SPG's consumer awareness to 50 percent.

In June 1999 SPG demanded that mySimon stop using the "mySimon" name. When mySimon refused, SPG sued under the Lanham Act (and various state statutes), alleging that SPG owned exclusive rights to the "Simon" name and that mySimon's name, Web address, and cartoon mascot named "Simon" infringed on it rights. SPG moved for a temporary restraining order and preliminary injunction. The district court denied the TRO motion after a 2-day hearing. SPG then withdrew its motion for preliminary injunction. It never renewed its request for interlocutory injunctive relief while the case moved forward in the district court.

Eventually the case was tried to a jury. SPG won a verdict despite presenting relatively weak evidence that its "Simon" name had attained secondary meaning or that consumers were likely to confuse SPG with mySimon. For example, the vast majority of SPG's "consumer" witnesses who testified that they had heard of SPG were professionals whose jobs required them to be aware of the company. They included employees of SPG's advertising agency, real estate analysts who covered SPG, executives of the National Association of Real Estate Investment Trusts (of which SPG is a member), and members of a law firm that represents SPG. Indeed, because SPG's witnesses were so unrepresentative of the average

consumer, the district court termed their testimony regarding secondary meaning "so slight as to amount to almost nothing." Additionally, the district court noted, "Simon" is an extremely common first name and surname, weakening SPG's argument that mySimon's use of the name is likely to confuse consumers.

In contrast, mySimon presented substantial survey evidence demonstrating that there was no likelihood of confusion between mySimon and SPG. Two of the four surveys involved showing consumers in shopping malls either a mySimon advertisement or a picture of its home page. The survey respondents were then asked which company they thought put out the advertisement or the Web page. Respondents were also asked what other products or services they believed were put out by the same company and whether they believed that the company whose ad or Web page they believed that they were seeing was related to any other company. The format of the other two surveys involved asking Internet users similar questions about the mySimon Web site. The surveys were conducted in June of 2000, after the SPG branding campaign. mySimon's expert witness in consumer research (whose name, coincidentally, is Itamar Simonson) testified that the average result across the four surveys showed a "completely negligible" likelihood of confusion, with under 2 percent of respondents indicating relevant confusion. SPG presented no survey evidence about the likelihood of consumer confusion.

Despite the relative strength of mySimon's evidence and the relative weakness of SPG's, SPG's lawyer must have done a whale of a selling job as the jury awarded the company $11.5 million in mySimon's "profits" (although mySimon had not yet earned any profits), $5.3 million in corrective advertising (although SPG had not engaged in any corrective advertising), and $10 million in state law punitive damages.

After the jury spoke, SPG requested a permanent injunction barring mySimon from using the name "Simon." The district court crafted an order permanently enjoining mySimon from using the "Simon" and "mySimon" names, the Web address www.mysimon.com, and its "Simon" cartoon

mascot. Under the injunction, traffic to the www.mysimon.com Web site would be automatically redirected to mySimon's new site for one year after final judgment. During that year, the company would be allowed to use the mySimon name on its Web site, but only to inform visitors of its new name. After the transition period, mySimon would be required to transfer the www.mysimon.com domain name to SPG. The district court stated that the injunction was to issue upon entry of a final judgment, a matter that still must be worked out.

mySimon moved for judgment as a matter of law and a new trial. The district court (Judge David F. Hamilton) granted in part and denied in part these motions. Judge Hamilton expressed serious doubt regarding the strength of SPG's evidence but declined to overturn the jury's verdict on liability. The judge did, however, set aside the $11.5 million damages award because he found that requiring mySimon to change its name provided sufficient relief, as SPG's damages expert had based his estimate on the assumption that mySimon would continue to use the mySimon name indefinitely. The court also held that the $5.3 million corrective advertising award was arbitrary and not supported by the evidence. Consequently, Judge Hamilton ordered a new trial on the corrective advertising issue, subject to SPG's acceptance of a remittitur to nominal damages of $10. Because Indiana law limits punitive damages to the greater of $50,000 or three times compensatory damages, the judge also reduced the jury's $10 million punitive damages award to $50,000 pending SPG's decision with respect to the remittitur.

SPG rejected the remittitur and did not ask the district court to reconsider any aspect of its opinion. Therefore, final judgment will not enter until completion of a new trial on the corrective advertising issue, and the injunction has not issued. SPG filed a notice of appeal seeking immediate issuance of the injunction and a reduction of the Web site transition period from 1 year to 30 days. SPG claims that we have subject matter jurisdiction because the district court's delay in issuing the injunction was, effectively, a denial of injunctive relief, which is appealable. See 28

U.S.C. sec. 1292(a)(1).

   We distinguish between merely postponing relief and denying a request for an injunction. If the district court's decision simply postpones injunctive relief, a party attempting to appeal must show both that the district court's decision was a definitive disposition of the request for relief and that irreparable harm will result from a delay. See Donovan v. Robbins, 752 F.2d 1170, 1173-74 (7th Cir. 1985)./1

   Donovan rested on the Supreme Court's holding in Carson v. American Brands, 450 U.S. 79 (1981). There, the Court held that the district court's refusal to enter a proposed consent decree was immediately appealable because it had the same practical effect as a refusal to enter an injunction and would cause irreparable harm if not appealable. See id. at 84, 86. But because sec. 1292(a)(1) was intended to carve out only a limited exception to the final-judgment rule, the Court held in Carson that the statute is to be construed narrowly. See id. For example, the Court noted that the interlocutory orders in Switzerland Cheese Ass'n v. E. Horne's Market, Inc., 385 U.S. 23 (1966), and Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478 (1978), were not appealable because neither petitioner sought a preliminary injunction, thereby undercutting the argument that delaying review would cause irreparable harm. See Carson, 420 U.S. at 85; see also Anderson v. City of Boston, 244 F.3d 236, 239 (1st Cir. 2001) (holding that court of appeals lacked jurisdiction because appellants did not appeal from denial of interim relief or seek other avenues of interlocutory appeal, such as separate final judgment on dismissed claims under Fed. R. Civ. P. 54(b) or certification for interlocutory appeal under 28 U.S.C. sec. 1292(b)); Huminski v. Rutland Police Dep't, 221 F.3d 357, 361 (2d Cir. 2000) (holding same and also noting that appellant made no effort to expedite appeal).

   Here, SPG voluntarily abandoned its quest for a preliminary injunction after the district court denied its TRO motion. This strongly undermines its argument today that a delay in issuing a permanent injunction will cause it to suffer irreparable harm. SPG cites Processed

Plastic Co. v. Warner Communications, Inc., 675 F.2d 852 (7th Cir. 1982), for the proposition that its inability to control the nature and quality of mySimon's services is "the most corrosive and irreparable harm attributable to trademark infringement." See id. at 858 (quoting 4 R. Calmann, Unfair Competition, Trademarks and Monopolies, section 88.3 (b) at 205 (3rd ed. 1970)). The potential threat to SPG's name is questionable. SPG and mySimon do not offer similar services. SPG offered rather weak evidence of the likelihood of confusion between the two enterprises, whereas mySimon presented survey evidence showing that there was a negligible risk of confusion. We think SPG's plea of irreparable harm is thin at best.

Nor can SPG show that the district court's decision was a definitive disposition with regard to injunctive relief. The judge, as the case continues, is free to revise his ruling at any time before entering final judgment. See Samayoa v. Chicago Bd. of Educ., 783 F.2d 102, 104 (7th Cir. 1986). Therefore, because SPG cannot show that the district court's decision to delay entry of the injunction was a definitive disposition causing SPG irreparable harm, we lack jurisdiction.

APPEAL DISMISSED.

FOOTNOTE

/1 SPG argues that it is not required to show irreparable harm under Holmes v. Fisher, 854 F.2d 229 (7th Cir. 1988). We held in Holmes, however, that irreparable injury is not relevant only where the district court's order is unquestion- ably the denial of an injunction. See id. at 231. Here, the district court's decision was not unquestionably the denial of an injunction.